UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:10-CV-08-BR

| | | |
|---|---|---|
| PAUL H. FELDMAN | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARTIN L. PERRY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | ORDER |
| | ) | |
| LAW ENFORCEMENT ASSOCIATES | ) | |
| CORPORATION, *et al.*, | ) | |
| Defendants. | ) | |

This matter is before the court on the 23 January 2013 motion for summary judgment filed by defendants Law Enforcement Associates Corporation ("LEA"), Anthony Rand ("Rand"), James J. Lindsay ("Lindsay"), Joseph A. Jordan ("Jordan") and Paul Briggs ("Briggs").[1]  (DE # 92.)  Also before the court is the 11 February 2013 motion filed by plaintiffs Paul H. Feldman ("Feldman") and Martin L. Perry ("Perry")[2] to continue the trial and plaintiffs' 13 February 2013 motion for leave to file a separate statement of material facts in conjunction with their opposition to defendants' motion for summary judgment.  (DE ## 95, 97.)  The motions are ripe for disposition.

## I.  FACTUAL AND PROCEDURAL HISTORY

This case was previously before the court on defendants' motion to dismiss.  (DE # 37.)  On 10 March 2011, the motion was granted in part and denied in part.  (DE # 57.)  See Feldman

---

[1] For the sake of convenience, LEA, Rand, Lindsay, Jordan, and Briggs may also be referred to jointly as "defendants."

[2] For the sake of convenience, Feldman and Perry may also be referred to jointly as "plaintiffs."

<u>v. Law Enforcement Assocs. Corp.</u>, 779 F. Supp. 2d 472 (E.D.N.C. 2011).  Although the 10

March 2011 order set forth the relevant factual allegations that were before the court at the time

of the decision, subsequent discovery has revealed facts that differ in varying degrees from those

alleged in the amended complaint.  The court also notes that the parties sharply dispute a large

number of facts at the summary judgment stage of the proceedings.  Instead of cataloging and

discussing each of these disputes, the court will focus on the facts that are germane to the

resolution of the issues presented.  Because the court's findings make many of the contested

areas of fact irrelevant, numerous facts submitted by the parties are omitted.  Additional relevant

facts will be set forth as appropriate in the discussion section of this opinion.

LEA is a manufacturer of security and surveillance equipment used by local, state,

federal, and international law enforcement agencies and by public and private companies.  (Am.

Compl., DE # 34, ¶¶ 4, 22; M. Perry Dep., DE # 99-2, at 14:7-20; J. Lindsay Dep., DE # 99-7, at

15:10-14; J. Jordan Dep., DE # 99-17, at 31:17-32:2.)  The company was founded by John

Carrington ("Carrington"), who also owned Sirchie Fingerprint Laboratories, Inc. ("Sirchie").

(P. Feldman Dep., DE # 99-4, at 13:12-18; 17:4-7.)  Carrington appointed Feldman to become

President of LEA at some time prior to 2001, and Feldman remained the company's President

and CEO through 27 August 2009.  (<u>Id.</u> at 23:16-28:7.)

Perry was initially a sales contractor who conducted business with LEA.  (M. Perry Dep.,

DE # 99-2, at 15:1-17:7; P. Feldman Dep., DE # 99-4, at 28:8-19.)  In 2006, Feldman hired Perry

to be LEA's Vice President of Sales and Marketing.  (M. Perry Dep., DE # 99-2, at 21:5-24.)

Perry was the second highest ranking employee at LEA and reported directly to Feldman.  (<u>Id.</u> at

22:10-13; 27:18-21; P. Feldman Dep., DE # 99-4, at 42:14-16.)

2

In 2005, Carrington pled guilty to export violations involving Sirchie. (M. White Dep., DE # 92-8, Ex. 19.) As a result, he was subjected to an Export Denial Order, which precluded him from engaging in certain export activities for five years. (Id.) In relation to these legal issues, Carrington resigned from LEA's Board of Directors ("Board") in April 2005, and he has not been a Board member, officer, or employee of LEA since that time. (P. Feldman Dep., DE # 99-4, at 39:25-40:25; J. Lindsay Dep., DE # 99-7, at 14:5-10.) Carrington did continue to hold a significant amount of LEA stock. (P. Feldman Dep., DE # 99-4, at 26:7-13.)

During the time period relevant to this lawsuit, LEA's Board consisted of five members: Feldman, Perry, Rand, Lindsay, and Jordan. (A. Rand Aff., DE # 92-15, ¶ 2; J. Jordan Aff., DE # 92-16, ¶ 2; J. Lindsay Aff., DE # 92-17, ¶ 2; A. Rand Suppl. Aff., DE # 92-19, ¶ 2; M. Perry Dep., DE # 99-2, at 29:6-30:21 & Ex. 38, DE # 92-3, at 222;[3] P. Feldman Dep., DE # 99-4, at 39:5-6; 44:10-25; M. Finkelstein Dep., DE # 99-9, at 17:4-7.) Feldman and Perry will be referred to as the "Inside Directors" because they were both directors and employees of LEA. Rand, Lindsay, and Jordan will be referred to as the "Outside Directors" because they were never employees of the company.

An "extraordinarily palpable" split existed between the Inside Directors and the Outside Directors since at least 1 November 2007. (M. Finkelstein Dep., DE # 99-9, at 20:18; see also id. at 22:2-7; 42:7-11; 69:14-19; P. Briggs Aff., DE # 92-7, ¶ 5; Pls.' Statement Material Facts, DE # 99-1, at 2 ¶ B; P. Briggs Dep., DE # 99-5, at 262:16-263:2; E. Littman Dep., DE # 99-15,

---

[3] The court notes that it has utilized plaintiffs' filings as much as possible when citing to deposition testimony because plaintiffs have submitted the witnesses' deposition transcripts in their entirety. However, when citing to certain exhibits that accompany the deposition testimony, it has been necessary for the court to refer to defendants' submissions. In these instances, the page citations to the deposition exhibits are to those generated by CM/ECF.

at 39:20-40:12; Pls.' Mem. Opp'n Mot. Summ. J., Ex. 19, DE # 99-20.)  The exact reason for the

split is hotly disputed, but it is apparent from the record that it was related to the announcement

of Carrington's sale of LEA stock to Raymond James.  The Outside Directors contend that this

event damaged the relationship between them and the Inside Directors because Feldman was

angry about the sale.  Carrington had previously told Feldman that he did not intend to sell LEA

and that he would give Feldman a chance to purchase his stock if he ever did try to sell the

company.  (P. Briggs Aff., DE # 92-7, ¶ 3; P. Briggs Aff., DE # 92-13, ¶¶ 14-15; S. Carrington

Aff., DE # 92-14, ¶ 3; P. Feldman Dep., DE # 99-4, at 180:6-181:25; M. White Dep., DE # 99-6,

at 43:20-44:21; E. Littman Dep., DE # 99-15, at 156:21-157:15.)  In contrast, plaintiffs maintain

that the proposed sale soured relations not because Feldman was angry about the sale, but

because the Outside Directors, who had personal relationships with Carrington, became

consumed with protecting Carrington and with ensuring that the sale of the company would go

through.  (Pls.' Statement Material Facts, DE # 99-1, at 22-25 § III.A.; P. Briggs Dep., DE # 99-

5, at 265:14-266:1; E. Littman Dep., DE # 99-15, at 38:7-39:12; 53:4-54:18; 71:19-74:4.)

      In or around December 2007, plaintiffs confirmed that Carrington owned fifty percent of

a company called SAFE Source.  (M. Perry Dep., DE # 99-2, at 243:9-12; 245:14-247:11; P.

Feldman Dep., DE # 99-4, at 178:8-180:5; P. Briggs Dep., DE # 99-5, at 184:16-185:1.)  In 2005

or 2006, LEA had shipped some of its products to SAFE Source, and SAFE Source then

exported the products to Chile.  (M. Perry Dep., DE # 99-2, at 247:8-11; P. Feldman Dep., DE #

99-4, at 176:13-16; P. Briggs Dep., DE # 99-5, at 169:10-170:12; 174:10-18.)  Because

Carrington had been banned from making exports for five years and because he had an

ownership interest in SAFE Source, plaintiffs maintain that it was illegal for SAFE Source to

4

engage in the export business.  (Pls.' Mem. Opp'n Mot. Summ. J., Ex. 44, DE # 99-45.)

A meeting of LEA's Board was conducted on 27 December 2007.  There is a sharp dispute about what was said and by whom at the meeting, and competing versions of the meeting minutes were subsequently circulated.  (Defs.' Mem. Supp. Mot. Summ. J., DE # 92-1, at 4-5; M. Perry Dep., DE # 99-2, at 249:16-250:6 & Ex. 38, DE # 92-3, at 221, 227-28; P. Feldman Dep., DE # 99-4, at 188:13-24.)  At this meeting, plaintiffs contend that Feldman notified the Board that there were possible export violations relating to Carrington and SAFE Source and that these violations needed to be reported to the proper governmental agencies.  (M. Perry Dep., DE # 99-2, at 324:3-325:20; P. Feldman Dep., DE # 99-4, at 188:13-191:12.)  Plaintiffs believed that LEA's involvement with SAFE Source caused LEA to engage in illegal exports and that this involvement with SAFE Source also constituted violations of the Securities and Exchange Commission's rules governing internal accounting controls.  (M. Perry Dep., DE # 99-2, at 324:3-325:1.)  On 14 January 2008, plaintiffs sent a letter to Phil Kuhn, an agent with the Bureau of Industry and Security, which is a division of the Department of Commerce, regarding Carrington's ownership of SAFE Source and the illegal export business that SAFE Source conducted with LEA.  (M. Perry Dep., DE # 99-2, at 222:3-6; 228:9-21; 264:13-265:1; P. Feldman Dep., DE # 99-4, at 166:7-167:2; Pls.' Mem. Opp'n Mot. Summ. J., Ex. 44, DE # 99-45.)

In February or March 2008, Feldman relocated LEA's headquarters from Youngsville, North Carolina to Raleigh, North Carolina.  (A. Rand Aff., DE # 92-15, ¶ 10; P. Feldman Dep., DE # 99-4, at 198:23-202:10 & Ex. 63, DE # 92-4, at 113; P. Briggs Dep., DE # 99-5, at 124:20-22.)  The Outside Directors were concerned about possibly being obligated under the old and

new leases, and they viewed Feldman's actions as insubordination because he had been instructed not to go forward with the new lease until the Outside Directors could review the matter. (M. Perry Dep., Ex. 38, DE # 92-3, at 225-26; P. Feldman Dep., Ex. 63, DE # 92-4, at 113; A. Rand Aff., DE # 92-15, ¶ 10; J. Jordan Aff., DE # 92-16, ¶ 4; J. Lindsay Aff., DE # 92-17, ¶ 7; A. Rand Dep., DE # 99-3, at 203:9-204:6, 262:22-263:6; 264:7-11; P. Briggs Dep., DE # 99-5, at 141:2-142:11; J. Lindsay Dep., DE # 99-7, at 57:10-60:2; M. Finkelstein Dep., DE # 99-9, at 36:22-37:2; 141:12-20; 148:3-11; E. Littman Dep., DE # 99-15, at 70:19-71:14.) Feldman claims that he moved LEA to a new location because it benefitted the company in numerous ways. (Pls.' Statement Material Facts, DE # 99-1, at 35-39 § III.G.; P. Briggs Dep., DE # 99-5, at 123:10-124:19; 127:3-140:19.)

In 2009, Feldman and other LEA representatives met with LEA shareholders Joseph and Barbara Wortley (the "Wortleys"), who were threatening to sue LEA. (M. Perry Dep., DE # 99-2, at 39:2-14; P. Feldman Dep., DE # 99-4, at 65:19-66:3; P. Briggs Dep., DE # 99-5, at 154:11-155:1; E. Littman Dep., DE # 99-15, at 92:8-93:13.) Joseph Wortley "voiced his dissatisfaction with the board of directors . . . ." (E. Littman Dep., DE # 99-15, at 94:12-13.) In response, Feldman stated that the Board "could do more to help the company" and that "he too wished they would do more." (Id. at 95:11-12, 17; see also id., Ex. 26, DE # 92-12, at 256:21-258:10; P. Briggs Dep., DE # 99-5, at 155:14-157:19.) After meeting with the Wortleys, Feldman wrote to the Outside Directors and urged them to resign from the Board. (E. Littman Dep., Ex. 26, DE # 92-12, at 253:25-254:20; J. Jordan Dep., DE # 99-17, at 35:14-36:3.)

On 26 August 2009, Rand asked Perry to meet him for lunch. (A. Rand Aff., DE # 92-15, ¶ 14; M. Perry Dep., DE # 99-2, at 33:6-34:8.) Perry told Feldman about the invitation, and

they decided to surreptitiously tape the meeting.  Perry wore a hidden recorder to the lunch.  (M. Perry Dep., DE # 99-2, at 34:14-36:12; P. Feldman Dep., DE # 99-4, at 59:15-61:23; 63:10-17.)  At the lunch, Rand informed Perry in confidence that the Outside Directors planned to terminate Feldman during the Board meeting scheduled for the following day because the Board had lost confidence in him and because of the "Wortley situation."  (M. Perry Dep., DE # 99-2, at 38:1, 25; see also id. at 37:2-39:1; 39:25-40:5 & Ex. 4, DE # 92-3, at 18:2-22; 20:13-22:4; A. Rand Aff., DE # 92-15, ¶¶ 11, 14; J. Jordan Aff., DE # 92-16, ¶ 5; J. Lindsay Aff., DE # 92-17, ¶¶ 7-8; A. Rand Dep., DE # 99-3, at 262:12-21 & Ex. 33, DE # 92-10, at 70; J. Lindsay Dep., DE # 99-7, at 66:13-20; J. Jordan Dep., DE # 99-17, at 35:14-36:3; 53:15-54:11.)  Rand also told Perry that Alan Terry would be named Interim President of LEA and that the Outside Directors wanted Perry to stay employed.  (A. Rand Aff., DE # 92-15, ¶¶ 13-14; M. Perry Dep., DE # 99-2, at 38:11-12; 39:15-20 & Ex. 4, DE # 92-3, at 18:9-18; 25:17-18; 26:3-4; 40:9-20; 54:21-55:6.)  Immediately thereafter, Perry told Feldman what Rand said during the lunch.  (M. Perry Dep., DE # 99-2, at 43:6-45:2; P. Feldman Dep., DE # 99-4, at 65:7-18.)

After learning of his impending termination, Feldman went to the hospital during the evening of 26 August 2009, claiming that he was possibly having a transient ischemic attack.  (P. Feldman Dep., DE # 99-4, at 132:8-135:20 & Ex. 49, DE # 92-4, at 87.)  Feldman did not attend the 27 August 2009 Board meeting, and his employment was terminated during that meeting.  (A. Rand Aff., DE # 92-15, ¶¶ 13, 19; J. Jordan Aff., DE # 92-16, ¶ 8; M. Perry Dep., Ex. 7, DE # 92-3, at 125; P. Feldman Dep., DE # 99-4, at 77:6-11; 78:23-80:10.)

Perry, who had a history of multiple sclerosis, was also unable to attend the 27 August 2009 Board meeting because he was taken to the hospital that day.  (M. Perry Dep., DE # 99-2,

at 57:1-60:10; 154:1-156:5 & Ex. 30, DE # 92-3, at 192-99.)  He was diagnosed as having suffered an acute multiple sclerosis flare.  (Id., Ex. 30, DE # 92-3, at 198.)  Perry did not return to work after 27 August 2009.  (Id., DE # 99-2, at 66:1-4.)  On 14 September 2009, Alan Terry ("Terry"), LEA's new President, sent Perry a letter stating that Perry had failed to respond to communications from LEA.  (Id., Ex. 14, DE # 92-3, at 132.)  Terry also demanded an immediate response from Perry regarding his intentions about returning to work.  (Id.)  When LEA did not receive a response to the 14 September 2009 letter, Briggs, LEA's Chief Financial Officer, sent a letter to Perry on 23 September 2009.  (Id., Ex. 15, DE # 92-3, at 133.)  Briggs stated that LEA had no choice but to conclude that Perry had "abandoned" his job.  (Id.)  LEA considered Perry to have voluntarily quit as of the date of the letter.  (Id.)

Although plaintiffs initially filed separate complaints, they subsequently filed a consolidated complaint in this matter on 16 April 2010.  (DE # 31.)  Plaintiffs filed an amended complaint on 7 June 2010.  (DE # 34.)  Defendants filed a motion to dismiss on 21 June 2010, which was granted in part and denied in part on 10 March 2011.  (DE ## 37, 57.)  The claims remaining in this case are (1) both plaintiffs' claims against LEA under the Americans with Disabilities Act; (2) both plaintiffs' whistleblower claims against all defendants under the Sarbanes-Oxley Act of 2002 to the extent that they rely on actions taken by Feldman prior to 27 August 2009 or actions taken by Perry prior to 23 September 2009; (3) Perry's claim against LEA under the North Carolina Wage and Hour Act; and (4) Perry's breach of contract claim against LEA.  See Feldman, 779 F. Supp. 2d at 502.  Also remaining before the court is LEA's counterclaim against plaintiffs for breach of fiduciary duty.  (Defs.' Answer, DE # 36, at 44-57.)

## II. DISCUSSION

A.  Plaintiffs' Motion for Leave to File Separate Statement of Material Facts in Dispute

As an initial matter, the court considers plaintiffs' motion for leave to file a separate statement of material facts in dispute in conjunction with their opposition to defendants' motion for summary judgment.  (DE # 97.)  Defendants argue that plaintiffs' opposition, taken as a whole, violates Local Civil Rule 7.2(e), which requires a memorandum filed in opposition to a motion to be thirty pages or less, excluding the certificate of service page.  In this case, while the body of plaintiffs' memorandum is thirty pages long (DE # 99), the memorandum also includes a separate fifty-two page statement of material facts in dispute that is attached as an appendix (DE # 99-1).  This district's Local Rules do not explicitly permit a separate submission of a statement of facts, and the court agrees with defendants that the document is an attempt to avoid the page limits set by Local Civil Rule 7.2(e).  Nevertheless, the court will not disregard the separate statement of facts, and plaintiffs' motion for leave to file the statement will be granted.  Cf. Trustees of Nev. Resort Ass'n v. Grasswood Partners, Inc., No. 2-11-cv-00044-MMD-NJK, 2013 WL 1249617, at *4 (D. Nev. Mar. 27, 2013).

B.  Defendants' Motion for Summary Judgment

1.  Summary Judgment Standard

Summary judgment is proper only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law."  Haavistola v. Cmty. Fire Co. of Rising Sun,

9

<u>Inc.</u>, 6 F.3d 211, 214 (4th Cir. 1993). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. <u>Id.</u>

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party. <u>Id.</u> at 255. The moving party has the burden to show an absence of evidence to support the non-moving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. <u>Anderson</u>, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. <u>Id.</u> at 252. Furthermore, evidence that is "merely colorable" or "not significantly probative" will not suffice to defeat a motion for summary judgment. <u>Id.</u> at 249. Rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then disposition by summary judgment is appropriate. <u>Id.</u> at 250; <u>see</u> <u>also</u> <u>Teamsters Joint Council No. 83 v. Centra, Inc.</u>, 947 F.2d 115, 119 (4th Cir. 1991).

As mentioned previously, defendants' 21 June 2010 motion to dismiss was granted in part and denied in part. <u>See</u> <u>Feldman</u>, 779 F. Supp. 2d at 502. A motion to dismiss, granted or denied, may have an effect on a subsequent motion for summary judgment. However, "[i]n general, 'the ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from

subsequently being granted based on material outside the complaint.'" PDK Labs Inc. v. Ashcroft, 338 F. Supp. 2d 1, 6-7 (D.D.C. 2004) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 3D § 2713 at 233 (2d ed. 1998)); see also Wilderness Soc'y v. Griles, 824 F.2d 4, 16 (D.C. Cir. 1987) ("In sum, while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff.").

    2. Perry's North Carolina Wage and Hour Act Claim/Breach of Contract Claim

    In this case, Perry's breach of contract claim against LEA is brought in the alternative to his claim under the North Carolina Wage and Hour Act. (Am. Compl., DE # 34, ¶¶ 333-338.) See Feldman, 779 F. Supp. 2d at 502. These claims are based on Feldman's oral promise to Perry of a bonus of $50,000 if LEA secured a large contract with the Census Bureau. (M. Perry Dep., DE # 99-2, at 291:21-296:11; P. Feldman Dep., DE # 99-4, at 225:18-230:22.) Although the Census Bureau contract was completed by June 2009, Feldman never paid the bonus to Perry. (Id.; P. Briggs Dep., DE # 99-5, at 22:19-23:13; 34:2-35:10; A. Rand Dep., DE # 99-44, at 349:1-15; 351:3-15.)

    The court finds that Perry has conceded that summary judgment is appropriate on both the wage claim and the contract claim because he has failed to respond to the arguments raised with respect to these claims in defendants' memorandum in support of the motion for summary judgment. See, e.g., Bayer Schering Pharma AG v. Watson Pharms., Inc., Nos. 2:07-CV-01472-KJD-GWF, 2:08-CV-00995-KJD-GWF, 2012 WL 1079574, at *7 (D. Nev. Mar. 30, 2012) (failure to oppose movant's argument in brief opposing motion for summary judgment

implicitly concedes the argument (citing S. Nev. Shell Dealers Ass'n v. Shell Oil Co., 725 F. Supp. 1104, 1109 (D. Nev. 1989)); Ferdinand-Davenport v. Children's Guild, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (plaintiff abandoned claim by failing to respond to defendant's argument); Klugel v. Small, 519 F. Supp. 2d 66, 72 (D.D.C. 2007) ("[W]hen a party does not address arguments raised by a movant, the court may treat those arguments as conceded.").

Even if Perry had not made such a concession, the wage claim and the contract claim would still fail. After Feldman's termination, LEA filed for bankruptcy. (A. Rand Dep., DE # 99-23, at 6:5-7:8.) On 12 July 2012, the United States Bankruptcy Court for the Eastern District of North Carolina ruled that "Feldman and Perry may continue to pursue their claims against LEA, to the extent that insurance coverage exists, in the U.S. District Court for the Eastern District of North Carolina. . . . Feldman and Perry will make no claims against the bankruptcy estate or the Chapter 7 trustee; and their recovery against LEA, if any, will be limited to the proceeds of any applicable insurance." (Defs.' Mot. Summ. J., Ex. S, DE # 92-21, at 1.) LEA has insurance coverage under an Employment Practices Liability Insurance policy issued by Zurich American Insurance Company. (Pls.' Mem. Opp'n Mot. Summ. J., Ex. 41, DE # 99-42.) The policy explicitly excludes coverage for contract claims and wage claims. (Id., Exclusions G. & H., at DEF-000418-19.) Accordingly, even if the court assumes *arguendo* that LEA owes Perry the $50,000 bonus, there can be no recovery as a result of the bankruptcy court's order. See, e.g., Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P., No. 5:09-CV-352-F, 2010 WL 5477260, at *3-4 (E.D.N.C. Dec. 28, 2010). Thus, summary judgment on these claims is warranted.

3. <u>Americans with Disabilities Act Claims</u>

Both Feldman and Perry assert claims against LEA for wrongful discharge and for failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It must be noted that Congress made substantial changes to the ADA through the ADA Amendments Act of 2008 ("ADAAA"), which has an effective date of 1 January 2009. Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (2008). The ADAAA was intended to clarify congressional intent with respect to the original ADA, as well as to overturn certain United States Supreme Court cases that had narrowed the ADA's scope. <u>Id.</u>, § 2(b), 122 Stat. at 3554. Under the ADAAA, "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). "The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). As determined previously, the ADAAA applies to plaintiffs' claims. <u>See</u> <u>Feldman</u>, 779 F. Supp. 2d at 483. Therefore, the court has considered plaintiffs' claims pursuant to this new standard.

a. <u>Wrongful Discharge Claims</u>

When only indirect or circumstantial evidence is available, a plaintiff alleging a violation of the ADA must meet the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Wilson v. Phoenix Specialty Mfg. Co., Inc.</u>, 513 F.3d 378, 387 (4th Cir. 2008); <u>Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.</u>, 53 F.3d 55, 58 (4th Cir. 1995). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. To

13

establish a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must show: that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001); see also Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001).

If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. Should the defendant carry this burden, the plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). The ultimate burden of proving that "the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (citation and internal quotation marks omitted).

### (1) Feldman

The first element of Feldman's wrongful discharge claim requires a showing that he was "disabled" within the meaning of the ADA. Reynolds, 701 F.3d at 150; Rhoads, 257 F.3d at 387; Lochridge v. City of Winston-Salem, 388 F. Supp. 2d 618, 625 (M.D.N.C. 2005). "The question of whether a plaintiff is disabled under the ADA, 'and therefore can bring a claim under the statute, is a question of law for the court, not a question of fact for the jury.'" Rose v. Home Depot USA, Inc., 186 F. Supp. 2d 595, 608 (D. Md. 2002) (quoting Hooven-Lewis v. Caldera,

249 F.3d 259, 268 (4th Cir. 2001) (Rehabilitation Act case)). The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . . " 42 U.S.C. § 12102(1). There is no dispute that Feldman is proceeding under the first prong of the disability definition.

On 26 August 2009, after learning of his impending termination, Feldman went to the hospital claiming that he was possibly having a transient ischemic attack ("TIA"), which is also known as a "mini-stroke." (P. Feldman Dep., DE # 99-4, at 74:1-4; 75:17-21; 132:8-135:20 & Ex. 49, DE # 92-4, at 87.) He was admitted overnight for observation and testing. His diagnostic tests were all normal, and he was discharged the following day with no restrictions. (Defs.' Mot. Summ. J., Ex. P, DE # 92-18; P. Feldman Dep., DE # 99-4, at 136:12-17; 141:18-145:25 & Exs. 49-50, DE # 92-4, at 85-91.) Medical records from his 1 September 2009 follow-up visit with his primary care physician reflect that he may have had a "mild TIA" that had "since resolved." (P. Feldman Dep., Ex. 54, DE # 92-4, at 92.) At that appointment, no restrictions were placed on Feldman, and he continued on his prior medications. (Id. at 93.) He did not see his doctor again until 23 November 2009, and that visit was for stress related to a deposition. (Id. at 96.)

Feldman's only argument with respect to this issue is that his TIA was a disability by virtue of the fact that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). However, a TIA is an acute condition that is different from the more chronic conditions – such as cancer, epilepsy, multiple sclerosis, asthma, major depressive disorder, bipolar disorder, schizophrenia,

hypertension, diabetes, and post-traumatic stress disorder – that Congress intended to include within the definition of a disability through the enactment of this provision. See 29 C.F.R. Pt. 1630, App'x § 1630.2(j)(1)(vii); Mayo Clinic Staff, Definition of transient ischemic attack (TIA), The Mayo Clinic, http://www.mayoclinic.com/health/transient-ischemic-attack/DS00220 (last visited June 27, 2013) ("A transient ischemic attack (TIA) is like a stroke, producing similar symptoms, but usually lasting only a few minutes and causing no permanent damage. Often called a mini stroke, a transient ischemic attack may be a warning. About 1 in 3 people who have a transient ischemic attack eventually has a stroke, with about half occurring within a year after the transient ischemic attack."); cf. Butler v. BTC Foods Inc., Civ. A. No. 12-492, 2012 WL 5315034, at *3 (E.D. Pa. Oct. 19, 2012) (finding on a Rule 12(b)(6) motion to dismiss that 42 U.S.C. § 12102(4)(D) did not apply to plaintiff's case where he failed to allege that his hernia was "anything more than a one-time occurrence").

Furthermore, even if a TIA is an impairment that is episodic or in remission, and assuming that Feldman did in fact experience a TIA on 26 August 2009, the recognition of a plaintiff's impairment is only a threshold issue in determining whether or not he has a disability under the ADA. Feldman must also show that his TIA "substantially limit[ed] a major life activity when active." 42 U.S.C. § 12102(4)(D); see also 42 U.S.C. § 12102(1)(A) ("disability" defined with respect to an individual as "a physical or mental impairment that substantially limits one or more major life activities of such individual"). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

16

In determining whether Feldman was substantially limited in performing one or more major life activities, the court is mindful that "[t]he ADAAA seeks to broaden the scope of disabilities covered by the ADA after that scope had been narrowed by Supreme Court interpretation." Kravits v. Shinseki, Civ. A. No. 10-861, 2012 WL 604169, at *5 (W.D. Pa. Feb. 24, 2012); see also 42 U.S.C. § 12102(4)(A) (instructing that the "[t]he definition of disability . . . shall be construed in favor of broad coverage"). Reflecting this purpose, the accompanying regulations of the Equal Employment Opportunity Commission provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). Nevertheless, "[w]hile Congress undoubtedly intended to broaden the scope of the ADA . . . , it remains the case that 'not every impairment will constitute a disability . . . .'" Brandon v. O'Mara, No. 10 Civ. 5174(RJH), 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

Here, Feldman has not offered any evidence beyond his overnight visit to the hospital to show that the TIA substantially impaired the major life activity of working[4] or any other major life activity. (See Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 17; Pls.' Statement Material Facts, DE # 99-1, at 43 § IV.A.) Feldman has not submitted an affidavit, nor did he testify during his deposition regarding how, if at all, the TIA limited his ability to perform any activities. The evidence in this case demonstrates that all of his diagnostic testing at the hospital was normal, that he was discharged from the hospital on 27 August 2009 with no restrictions, and that his primary care physician did not subject him to any restrictions following his 1

---

[4] In the amended complaint, working is the only major life activity that Feldman specifically claims to have been substantially limited in performing. (Am. Compl., DE # 34, ¶¶ 133, 220.)

September 2009 visit. Thus, even when viewing the facts relevant to Feldman's alleged TIA in the light most favorable to him, and assessing those facts under the more lenient analysis called for by the ADAAA, there is simply no evidence in the record which shows that the TIA substantially limited him in any major life activity. As a result, Feldman was not disabled when he was discharged from his position on 27 August 2009.

Moreover, even if the court were to assume that Feldman's scant evidence created a genuine dispute of material fact regarding the issue of whether he was disabled under the ADA, he must also show that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. To establish the fourth *prima facie* element of a wrongful discharge claim under the ADA, Feldman must present some "affirmative evidence that disability was a determining factor in the employer's decision." Ennis, 53 F.3d at 59. This burden is "not empty or perfunctory." Id. Furthermore, because liability under the ADA requires the employer to have discriminated because of the employee's disability, it follows that the employee must show that the employer knew of his alleged disability at the time it took the adverse employment action. That is, "an employee cannot be fired 'because of' a disability unless the decisionmaker has actual knowledge of the disability." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1185 (11th Cir. 2005) (emphasis in original); see also Huppenbauer v. May Dep't Stores Co., 99 F.3d 1130 (Table), No. 95-1032, 1996 WL 607087, at *7 (4th Cir. Oct. 23, 1996) (unpublished) ("At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee 'because of' some other reason." (quoting Hedberg v. Ind. Bell Tel. Co., Inc., 47 F.3d

18

928, 932 (7th Cir. 1995))); Trammell v. Raytheon Missile Sys., 721 F. Supp. 2d 876, 878 (D.

Ariz. 2010).

In this case, Feldman fails to point to any evidence which shows that his employer knew

that he had been hospitalized when he was terminated during the 27 August 2009 Board meeting.

Rather, the evidence demonstrates that neither Feldman nor Perry notified the Outside Directors

about Feldman's condition. (M. Perry Dep., DE # 99-2, at 56:9-12; P. Feldman Dep., DE # 99-4,

at 77:2-5; A. Rand Suppl. Aff., DE # 92-19, ¶¶ 2-4.) In addition, Feldman's absence from the

Board meeting was expected because he had previously indicated that he would not be present.

(P. Feldman Dep., DE # 99-4, at 45:7-48:2 & Ex. 45, DE # 92-4, at 84; A. Rand Suppl. Aff., DE

# 92-19, ¶ 4.)

Furthermore, although Feldman's personal attorney, Joseph Jorgensen ("Jorgensen"),[5]

appeared at the Board meeting after it was already underway, the record evidence shows only

that Jorgensen "asked that the meeting be postponed." (A. Rand Suppl. Aff., DE # 92-19, ¶ 5.)

There is no evidence to establish that Jorgensen told the Outside Directors that Feldman had

been hospitalized or that he had suffered a TIA.[6] There is also no evidence to show that

Jorgensen specifically asked for an accommodation for Feldman for a reason related to a medical

condition.[7] Thus, no reasonable trier of fact could conclude that LEA knew about Feldman's

---

[5] Jorgensen had worked as an attorney for LEA prior to his personal representation of Feldman. (M. Perry Dep., DE # 99-2, at 244:23-245:2; P. Feldman Dep., DE # 99-4, at 67:1-68:16; E. Littman Dep., DE # 99-15, at 19:10-13.)

[6] The court finds it particularly telling that Jorgensen has failed to submit an affidavit detailing what he said at the 27 August 2009 Board meeting.

[7] In plaintiffs' Statement of Material Facts in Dispute, Feldman claims that "Jorgensen requested that LEA reasonably accommodate Feldman's disability by rescheduling the meeting until Feldman was able to attend." (Pls.' Statement Material Facts, DE # 99-1, at 44 § IV.B. ¶ 3.) To support this "fact," Feldman cites only to the allegations

(continued...)

19

condition when he was terminated on 27 August 2009.

Moreover, it is clear from the evidentiary record that the decision to terminate Feldman was made either prior to or at the same time that Feldman began to experience symptoms of a TIA.[8]  (See, e.g., A. Rand Aff., DE # 92-15, ¶¶ 10-14, 19; P. Feldman Dep., DE # 99-4, at 74:13-75:5; J. Lindsay Dep., DE # 99-7, at 64:18-66:22; J. Jordan Dep., DE # 99-17, at 34:7-36:19.) Feldman's experience of a physical impairment is a necessary antecedent to his showing that he was terminated because of a disability.  Because Feldman can only show at best that his TIA symptoms and the termination decision occurred contemporaneously, he cannot prove that discrimination was the motive for the adverse employment decision.  As a result, Feldman fails to establish the fourth element of his wrongful discharge claim.

Assuming for the sake of argument that Feldman could establish a *prima facie* case of

---

[7](...continued)
in plaintiffs' amended complaint and to defendants' memorandum in support of their motion for summary judgment. (Id.) Feldman may not rely on the allegations in plaintiffs' pleadings to defeat a motion for summary judgment. See, e.g., Cheeseweright v. Bank of Am., N.A., No. 2:11-cv-15631, 2013 WL 639135, at *7 (E.D. Mich. Feb. 21, 2013); Walton v. Chase Home Fin. LLC, No. 1:11-cv-00417-JMS-MJD, 2012 WL 6596879, at *1 (S.D. Ind. Dec. 18, 2012) ("Citing to allegations in a complaint does not comply with Rule 56.").

Furthermore, defendants' summary judgment memorandum states that "[t]he only 'accommodation' allegedly requested related to Feldman was Jorgensen's request to postpone the Board meeting after it was already underway." (Defs.' Mem. Supp. Mot. Summ. J., DE # 92-1, at 22 (emphasis added).)  It is evident from this language that LEA was not agreeing with Feldman's position but was merely detailing his argument with respect to the accommodation issue.  As a result, Feldman has failed to demonstrate that Jorgensen requested a reasonable accommodation on his behalf.

[8] It appears likely from the record that the decision to fire Feldman was made prior to his experiencing any symptoms of a TIA. Jordan spoke with Rand about Feldman's termination about a week before it occurred, and Jordan made arrangements to attend the 27 August 2009 Board meeting in person. (J. Jordan Dep., DE # 99-17, at 34:7-15.)  In preparation for Feldman's termination, Rand also arranged to have Terry serve as Interim President of LEA. (A. Rand Aff., DE # 92-15, ¶ 12.)

However, Lindsay could not recall exactly when he discussed Feldman's termination with Rand.  He testified that the discussion could have occurred on the morning of 26 August 2009. (J. Lindsay Dep., DE # 99-7, at 65:1-3.)  Similarly, Feldman could not recall exactly when he began to experience symptoms of a TIA.  He testified that the TIA symptoms could have started either before or after Perry's lunch with Rand on 26 August 2009. (P. Feldman Dep., DE # 99-4, at 74:13-21.)  Thus, when the facts are viewed in the light most favorable to Feldman, the final termination decision may have been made on the morning of 26 August 2009, which was the same time that Feldman could have started experiencing symptoms of a TIA.  As has already been demonstrated, the Outside Directors did not know that Feldman experienced symptoms of a TIA while he was at work on 26 August 2009.

discrimination within the <u>McDonnell Douglas</u> framework, LEA has produced evidence of

Feldman's insubordination, which is a legitimate, nondiscriminatory reason for his termination.

<u>Cf.</u> <u>Wilson v. UPS, Inc.</u>, Civ. A. No. 1:10-cv-636, 2012 WL 405064, at *5 (E.D. Va. Feb. 7)

(Title VII case), <u>aff'd</u>, 479 F. App'x 453 (4th Cir. 2012) (per curiam) (unpublished); <u>Smith v.</u>

<u>Martin</u>, No. 5:10-CV-248-D, 2011 WL 3703255, at *4 (E.D.N.C. Aug. 23, 2011) (same).  In

particular, LEA has pointed to the fact that Feldman moved the company's headquarters after

being instructed not to do so.  (<u>See</u>, <u>e.g.</u>, A. Rand Aff., DE # 92-15, ¶ 10; J. Jordan Aff., DE #

92-16, ¶ 4; J. Lindsay Aff., DE # 92-17, ¶ 7; A. Rand Dep., DE # 99-3, at 262:12-264:13.)  After

a history of conflict with the Outside Directors, Feldman was also deemed to have been

insubordinate when he made comments to the Wortleys about the Outside Directors's lack of

involvement in LEA's operations and then emailed the Outside Directors and urged them to

resign from the Board.[9]  (<u>See</u>, <u>e.g.</u>, E. Littman Dep., Ex. 26, DE # 92-12, at 253:25-254:20;

256:21-258:10; A. Rand Aff., DE # 92-15, ¶ 11; J. Jordan Aff., DE # 92-16, ¶ 5; J. Lindsay Aff.,

DE # 92-17, ¶¶ 7-8; A. Rand Dep., DE # 99-3, at 262:12-21 & Ex. 33, DE # 92-10, at 70; P.

Briggs Dep., DE # 99-5, at 155:14-157:19; J. Lindsay Dep., DE # 99-7, at 66:13-20; J. Jordan

Dep., DE # 99-17, at 35:14-36:19; 53:15-54:11.)

Because LEA has offered a legitimate, nondiscriminatory reason for Feldman's

termination, the burden shifts back to Feldman to raise a genuine dispute of material fact

---

[9] Feldman has admitted under oath in a deposition taken in another case that he wrote the following to the
Outside Directors:

> Quite frankly, I fail to see why the three of you want to remain on the Board given that
> you have no vested interest in the company and have expressed very little interest in
> helping out our business or being involved.  I really do believe that it is in the best
> interest of both LEA and the three of you to resign, but that is up to you.

(E. Littman Dep., Ex. 26, DE # 92-12, at 254:8-15.)

concerning pretext. Although Feldman attempts to show that he was meeting or actually exceeding LEA's performance expectations (see, e.g., Pls.' Statement Material Facts, DE # 99-1, at 33-35, 41-43 §§ III.F., III.I.), he was fired for insubordination and not just for substandard performance. He also attempts to demonstrate that he was not insubordinate (see, e.g., id. at 35-41, §§ III.G.-H.), but the Fourth Circuit has repeatedly explained that "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996) (citation and internal quotation marks omitted); see also Wilson, 2012 WL 405064, at *5 (plaintiff's "own subjective belief that he should not have been terminated, or that he was not insubordinate, is irrelevant"). The court need not decide "whether the [proffered] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (citation and internal quotation marks omitted).

Here, Feldman has failed to show that his employer did not honestly believe that he was insubordinate,[10] and there is simply no evidence in the record from which a rational fact finder could conclude that LEA's decision to terminate Feldman was a pretext designed to mask disability discrimination. Accordingly, the court will grant the motion for summary judgment as to Feldman's ADA wrongful discharge claim.

### (2) Perry

With respect to Perry's wrongful discharge claim, he too must first show that he was "disabled" within the meaning of the ADA. Reynolds, 701 F.3d at 150; Rhoads, 257 F.3d at

---

[10] In fact, Feldman has admitted under oath in a deposition taken in another case that it was "the Board's perce[ption]" that he "went down there [to meet with the Wortleys] and threw them[, i.e., the Outside Directors,] under the bus . . . ." (E. Littman Dep., Ex. 26, DE # 92-12, at 253:23-24.)

387; Lochridge, 388 F. Supp. 2d at 625. In this case, it is undisputed that Perry is proceeding under the first prong of the disability definition and that he suffers from multiple sclerosis ("MS"). (M. Perry Dep., DE # 99-2, at 154:1-156:5 & Ex. 30, DE # 92-3, at 195.) LEA has stated that "Perry can likely establish element 1 because the [ADAAA] seemingly finds MS to be a disability even when in remission." (Defs.' Mem. Supp. Mot. Summ. J., DE # 92-1, at 17-18 n.17.) As LEA has acknowledged, the ADAAA provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); see also 29 C.F.R. Pt. 1630, App'x § 1630.2(j)(1)(vii) (listing MS as an example of an impairment that is episodic or in remission). Furthermore, during his deposition, Perry testified regarding his substantial limitations in performing one or more major life activities. For example, he explained that he suffered from significant fatigue and weakness, that he had trouble walking, and that he could not drive a car while he was suffering from his MS flare-up. (M. Perry Dep., DE # 99-2, at 203:1-204:22.) Thus, the court finds that Perry has established the first element of his *prima facie* wrongful discharge claim.

LEA argues that Perry cannot establish the second element of his *prima facie* case because he was not discharged. Rather, LEA maintains that Perry abandoned his position and was deemed to have voluntarily quit. Although Perry contests many of the facts asserted by LEA regarding his separation from employment, the court finds that he does not dispute or has failed to sufficiently dispute the following facts:

1. Perry was the second highest ranking employee at LEA and thus had a critical position within the company. (Pls.' Statement Material Facts, DE # 99-1, at 2 ¶ F.)

2. LEA offered continued employment to Perry despite Feldman's termination. (M.

Perry Dep., DE # 99-2, at 39:15-20 & Ex. 4, DE # 92-3, at 18:9-10; 25:17-18; 26:3-4; 40:9-20; 54:21-55:6.)

    3.  Perry neither communicated directly with LEA nor performed work for LEA after he was admitted to the hospital on 27 August 2009. (Pls.' Statement Material Facts, DE # 99-1, at 3 ¶ S; M. Perry Dep., DE # 99-2, at 66:1-4; 85:20-86:1; 99:17-100:15; 208:3-12.)

    4.  Perry's wife communicated with Briggs on Perry's behalf on only two occasions – 31 August 2009 and 4 September 2009. (M. Perry Dep., DE # 99-2, at 76:12-25; 85:23-24; 205:6-7; 206:9-208:12 & Ex. 12, DE # 92-3, at 130; P. Briggs Dep., DE # 99-5, at 278:6-279:18; 281:13-282:20; 291:17.)

    5.  LEA's employee handbook states that employees who fail to report to work or contact their supervisor for two consecutive work days are deemed to have abandoned their job, and Perry signed a document acknowledging his receipt of the handbook. (M. Perry Dep., Ex. 19, DE # 92-3, at 147; Ex. 20, DE # 92-3, at 186.)

    6.  On 19 September 2009, Perry received a letter from Terry, LEA's Interim President, dated 14 September 2009,[11] which stated in part:

> You have not come to work since August 27 nor have you personally communicated with me. . . .  If I do not hear from you immediately, I will assume that it is your intention not to return.  Please communicate with me personally as soon as you receive this letter to let me know what your intentions are with regard to LEA.

(Id., DE # 99-2, at 86:2-88:21 & Ex. 14, DE # 92-3, at 132.)

---

[11] Perry contends that he did not receive Terry's letter in a timely fashion because it was left at a door of his residence that was not normally used by him or his family. (M. Perry Dep., DE # 99-2, at 86:18-87:17; 88:17-21.)

24

7.  Neither Perry nor his wife responded to the 14 September 2009 letter in any way.[12] (Id., DE # 99-2, at 90:19-91:2; A. Terry Aff., DE # 102-7, ¶¶ 6, 8.)

8.  LEA did not send the final separation letter concluding that Perry had abandoned his job until 23 September 2009, four days after Perry received the 14 September 2009 letter.  (M. Perry Dep., DE # 99-2, at 91:19-92:14; 94:3-9 & Ex. 15, DE # 92-3, at 133; P. Briggs Aff., DE # 92-7, ¶ 23.)

These facts show that Perry abandoned his job by failing to respond to Terry's 14 September 2009 letter.[13]  It is undisputed that Perry failed to follow company policy by not keeping LEA informed of his status.

Perry tries to create a genuine dispute of material fact with respect to this issue by arguing that he did not respond to Terry's letter because he was limited in his ability to communicate and because his doctor instructed him not to communicate directly with LEA. (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 23; M. Perry Dep., DE # 99-2, at 100:16-102:3; 213:12-214:5.)  Even if the court accepts Perry's arguments as to why he himself failed to respond to the letter, Perry fails to explain why his wife did not respond for him as she had on 31 August 2009 and 4 September 2009.  Although the 14 September 2009 letter called for a personal response from Perry, his wife could have informed Terry that Perry was incapable of communicating, that he was instructed by his doctor not to communicate with LEA, and that he

---

[12] The record demonstrates that Perry did not take the letter seriously.  During his deposition, he testified that he thought that the letter "was kind of crazy."  (M. Perry Dep., DE # 99-2, at 91:8.)  He also appears to have discounted the seriousness of the situation because LEA did not require him to sign for the letter.  (Id. at 91:8-9.)

[13] The court notes that the North Carolina Employment Security Commission also concluded that Perry abandoned his job when it denied his claim for unemployment benefits.  (M. Perry Dep., Ex. 22, DE # 92-3, at 187-90.)

needed more time off from work.  Perry himself acknowledges that "[t]here was no policy or practice at LEA that made it wrong for a spouse of an employee, on the employee's behalf, to inform the company that the employee was sick."  (Pls.' Statement Material Facts, DE # 99-1, at 48 § IV.D. ¶ 14; see also P. Briggs Dep., DE # 99-5, at 295:20-296:16.)  Given the history of communication between Perry's wife and Briggs, no reasonable jury could conclude that the directive from Perry's doctor definitively precluded him from having messages communicated to LEA on his behalf.  LEA's employee handbook required Perry to communicate with his managers (M. Perry Dep., Ex. 19, DE # 92-3, at 147), and his failure to do so resulted in his being deemed to have abandoned his position, just as he had been warned in the 14 September 2009 letter.

Perry also contends that he did not abandon his position because he claims that he was on medical leave on 23 September 2009, the date that LEA sent the final separation letter.  (See Pls.' Statement Material Facts, DE # 99-1, at 46 § IV.D. ("Perry was on medical leave from August 27, 2009 through September 23, 2009 and he did not abandon his position[.]").)  It is not disputed that Perry's wife spoke to Briggs over the telephone on 4 September 2009.  (M. Perry Dep., DE # 99-2, at 85:23-24; 205:6-7; 206:9-208:12 & Ex. 12, DE # 92-3, at 130; P. Briggs Dep., DE # 99-5, at 278:6-279:18; 281:13-282:20; 291:17.)  Perry maintains that his wife offered to provide a doctor's note to Briggs during this call, but Briggs did not want to see it.[14]  (M. Perry Dep., DE # 99-2, at 101:13-15; 180:9-16; 205:3-14; 205:22-206:2.)  At that time, Perry had in his possession a note from Dr. Mitchell Freedman ("Dr. Freedman"), dated 3 September

---

[14] In contrast, Briggs maintains that Perry's wife never mentioned a doctor's note or that Perry would be out of work for ten days.  (P. Briggs Dep., DE # 99-5, at 310:8-22; 311:17-312:17.)  However, the court is required to view the facts and draw reasonable inferences in the light most favorable to Perry, the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson, 477 U.S. at 255.

2009, placing him on "medical leave" for "10 days." (<u>Id.</u> at 179:21-25; 207:14-18; Defs.' Reply Supp. Mot. Summ. J., Ex. 1, DE # 102-1, at 5.) It is Perry's view that this language means ten business days rather than ten calendar days. (M. Perry Dep., DE # 99-2, at 179:21-180:8.) However, even if Perry's interpretation is correct, the note only excused him from working through Friday, 18 September 2009.[15] It did not excuse his non-responsiveness to LEA thereafter.

Perry also refers to a second doctor's note which stated that he "should be on medical leave for 3 more weeks from today for flare up of his multiple sclerosis." (Defs.' Reply Supp. Mot. Summ. J., Ex. B, DE # 102-2.) Although this note is surprisingly undated, Perry maintains that he obtained it from Dr. Freedman on 17 September 2009. (M. Perry Dep., DE # 99-2, at 96:11-97:6; 182:7-185:19; 202:10-24; <u>see</u> <u>also</u> Pls.' Mem. Opp'n Mot. Summ. J., Ex. 39, DE # 99-40.) However, it is undisputed that this second doctor's note was not offered or provided to LEA until <u>after</u> LEA had deemed Perry to have voluntarily quit his job on 23 September 2009. (M. Perry Dep., DE # 99-2, at 205:18-206:8 & Ex. 15, DE # 92-3, at 133; Defs.' Reply Supp. Mot. Summ. J., Ex. C, DE # 102-3.) Thus, Perry's attempt to rely on the second note from Dr. Freedman to show that he was on medical leave on 23 September 2009 is unpersuasive. Accordingly, no reasonable trier of fact could conclude that Perry was on medical leave on 23 September 2009.

Perry's reliance on the fact that Briggs did not want to see the 3 September 2009 note from Dr. Freedman is also unavailing. While an employer may ask an employee to furnish a

---

[15] In calculating this date, the court did not include the day on which the note was written, *i.e.*, 3 September 2009, or the Labor Day holiday, which occurred on 7 September 2009.

doctor's note to determine whether an absence is justified, the court is unaware of any authority requiring the employer to do so, and Perry has not pointed to any such authority. Furthermore, to the extent that Perry is arguing that Briggs was agreeing to an extended or indefinite leave of absence by declining the proffered doctor's note, such an inference is unreasonable based on the record evidence. When the evidence is viewed in the light most favorable to Perry, it demonstrates that his wife did not speak to Briggs in vague terms regarding the amount of time that he would be out of work. Rather, based on the note from Dr. Freedman, she specifically told Briggs that Perry would be out for "10 days" or "two weeks." (M. Perry Dep., DE # 99-2, at 205:22-206:2; 207:14-18; Defs.' Reply Supp. Mot. Summ. J., Ex. 1, DE # 102-1, at 5.) It is simply not reasonable to infer that an extended or indefinite period of medical leave was granted when a very specific period of leave was requested. Moreover, there is no evidentiary support for Perry's contention that his wife told Briggs that he would be out for "several weeks[]" or "at least two to three weeks." (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 2, 23.) Nor is it reasonable to infer that Perry was excused from communicating with LEA indefinitely based on the fact that Briggs did not want to see the note, particularly after Perry received the 14 September 2009 letter from Terry.

Finally, Perry attempts to create a genuine dispute of material fact by referencing the hire of Jay Becker ("Becker"). Perry argues that LEA hired Becker to replace him prior to his separation from employment with the company, thus evidencing LEA's intent to fire him. (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 2, 19, 23.) However, it is undisputed that Becker was

hired by Feldman prior to Feldman's termination.[16]  (Pls.' Statement Material Facts, DE # 99-1, at 50 § IV.E. ¶ 1; P. Briggs Dep., DE # 99-5, at 298:1-299:10; P. Briggs Suppl. Aff., DE # 102-4, ¶ 5.)  Thus, it is not reasonable to infer that the hiring of Becker was part of a scheme by the Outside Directors to terminate Perry.  Furthermore, both Briggs and Rand have testified that LEA did not intend to replace Perry with Becker when the offer to Becker was made; rather, Becker would have reported to Perry.  (A. Rand Dep., DE # 99-3, at 314:19-315:11; P. Briggs Dep., DE # 99-5, at 298:1-299:20; P. Briggs Suppl. Aff., DE # 102-4, ¶ 6.)  In addition, although Terry may have said that Perry would have to travel more upon his return from leave (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 19; P. Briggs Dep., DE # 99-5, at 301:11-303:11), this does not show that LEA intended to discharge Perry.  If anything, it demonstrates that Terry wanted him back at work.  As a result, Perry has failed to create a genuine dispute of material fact with regard to the second element of his wrongful discharge claim.

Perry is also unable to demonstrate the fourth element of his *prima facie* case.  Even if the court assumes *arguendo* that Perry was fired, there is no evidence that LEA terminated him because he had MS.  In fact, Perry testified that the Outside Directors knew of his MS for several years and that he had missed a month and a half of work in the past because of MS (M. Perry Dep., DE # 99-2, at 156:6-157:6), yet he has not alleged that LEA took any adverse action against him prior to September 2009.  Thus, he has failed to show that his separation from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination.  Cf. Brewington v. Getrag Corp., Civ. No. 5:09CV31-V, 2011 WL 4829399, at

---

[16] Perry emphasizes that Becker did not actually start working for LEA until 1 September 2009, subsequent to Feldman's termination.  (Pls.' Statement Material Facts, DE # 99-1, at 50 § IV.E. ¶ 1; P. Briggs Dep., DE # 99-5, at 299:2-10.)  Even so, this does not change the fact that he was hired by Feldman.

*6 (W.D.N.C. Oct. 12, 2011) (on a Rule 12(b)(6) motion to dismiss, an inference of discrimination could not be established where employer knew of plaintiff's disability for approximately three years before taking adverse action).

Moreover, even if Perry could establish a *prima facie* case of discrimination within the McDonnell Douglas framework, LEA has produced evidence of a legitimate, nondiscriminatory reason for its actions. At the time of Perry's separation from employment on 23 September 2009, LEA had a published policy which stated that "[e]mployees who fail to report to work or contact their supervisor for two (2) consecutive work days shall be considered to have abandoned the job without notice, effective at the end of their normal shift on the second day." (M. Perry Dep., Ex. 19, DE # 92-3, at 147.) Perry's employment with LEA ended after he failed to make contact with the company for more than two days following the expiration of his alleged ten-day medical leave, in violation of LEA's neutral attendance policy. This is a legitimate, nondiscriminatory reason for LEA's actions. See Ryan v. Columbus Reg'l Healthcare Sys., Inc., No. 7:10-CV-234-BR, 2012 WL 1230234, at *6 (E.D.N.C. Apr. 12, 2012) (employer produced a legitimate nondiscriminatory reason when it explained that plaintiff was terminated consistent with a neutral company policy). Finally, Perry has failed to raise a genuine dispute of material fact concerning pretext. He has failed to show that his employer did not honestly believe that he had abandoned his job, and there is simply no evidence in the record from which a rational fact finder could conclude that LEA's actions in separating Perry from his employment were a pretext designed to mask disability discrimination.[17]

---

[17] This conclusion is underscored by Perry's deposition testimony. When asked what proof he had to show that his separation from employment was related to his disability, he answered: "[W]ell, I was out with that disability when they fired me." (M. Perry Dep., DE # 99-2, at 208:25-209:1.) Such a meager response, by itself, is simply

(continued...)

30

b. <u>Failure to Accommodate Claims</u>

In a failure to accommodate case under the ADA, a plaintiff establishes a *prima facie* case by showing (1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. <u>Crabill v. Charlotte Mecklenburg Bd. of Educ.</u>, 423 F. App'x 314, 322 (4th Cir. 2011) (citing <u>Rhoads</u>, 257 F.3d at 387 n.11); <u>Haneke v. Mid-Atl. Capital Mgmt.</u>, 131 F. App'x 399, 400 (4th Cir. 2005).

(1) <u>Feldman</u>

A failure to accommodate claim requires a showing that the plaintiff is disabled within the meaning of the ADA. As the court has discussed previously with respect to his wrongful discharge claim, Feldman has failed to present evidence of a disability. <u>See</u> <u>discussion</u>, <u>supra</u>, at 14-18.

Furthermore, Feldman cannot meet the second element of his *prima facie* case, as there is no evidence in the record to show that LEA had notice of his alleged disability. <u>See</u> <u>discussion</u>, <u>supra</u>, at 18-20. With respect to this issue, the court emphasizes that although Jorgensen appeared at the 27 August 2009 Board meeting that resulted in Feldman's termination, he simply "asked that the meeting be postponed." (A. Rand Suppl. Aff., DE # 92-19, ¶ 5.) There is no evidence to show that Jorgensen told the Outside Directors at that meeting that Feldman had been hospitalized or that he was suffering from a TIA. There is also no evidence to show that

---

[17](...continued)
insufficient to establish pretext.

Jorgensen specifically asked for an accommodation for Feldman for a reason related to a medical condition. See EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011) (In order to trigger an employer's duty to accommodate a qualifying disability under the ADA, "the employee must make an adequate request, thereby putting the employer on notice."); Bourne v. Exempla, Inc., Civ. A. No. 12-cv-01477-PAB-BNB, 2013 WL 1232139, at *5 (D. Colo. Mar. 27, 2013) ("When an individual decides to request accommodation, the individual . . . must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition." (alteration in original) (citation and internal quotation marks omitted)); Woods v. Donahoe, Civ. A. No. 5:11-cv-00043, 2012 WL 2994445, at *7 (S.D. W. Va. July 20, 2012) (where plaintiff did not specifically ask for an accommodation, defendant's obligation to participate in the interactive process of determining a reasonable accommodation was not triggered). As a result, LEA is entitled to summary judgment on this claim.

(2) Perry

LEA argues that Perry cannot establish the fourth element of his ADA accommodation claim. "Implicit in that fourth element, is the requirement that the employee has, in good faith, engaged in an interactive process to identify, in cooperation with the employer, what would constitute a reasonable accommodation." May v. Roadway Express, Inc., 221 F. Supp. 2d 623, 627 (D. Md. 2002). As the Fourth Circuit Court of Appeals has emphasized with respect to the ADA interactive process:

> neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of

<u>initiation or response, may also be acting in bad faith.</u>  In essence, courts should attempt to isolate the cause of the breakdown and assign responsibility.

<u>Crabill</u>, 423 F. App'x at 323 (emphasis added) (citation omitted).  "[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal interactive process' is traceable to the employee and not the employer."  <u>May</u>, 221 F. Supp. 2d at 628 (citation and internal quotation marks omitted).

As discussed with respect to his wrongful discharge claim, it is undisputed that Perry received the 14 September 2009 letter from Terry, which demanded a response from him.  <u>See</u> <u>discussion</u>, <u>supra</u>, at 24-25.  It is also undisputed that Perry failed to respond to that letter.  <u>Id.</u> As with his wrongful discharge claim, Perry argues that he did not respond to the letter because he was limited in his ability to communicate and because his doctor instructed him not to communicate directly with LEA.  However, as the court has already determined, Perry's wife had a history of communicating with LEA, and she could have responded to the letter on his behalf.  <u>Id.</u> at 25-26.  As a result, the court finds that the breakdown of the interactive process in this case is attributable to Perry.  His undisputed and complete failure to respond to the 14 September 2009 letter is fatal to his failure to accommodate claim.[18]

Moreover, it is not clear in what manner LEA failed to accommodate Perry.  LEA's general awareness of Perry's disability does not trigger the duty to accommodate.  <u>See</u> <u>Boyer v.</u> <u>Fette Elec. Servs., LLC</u>, Civ. A. No. 4:10-cv-0704-JMC-TER, 2012 WL 684574, at *5 (D.S.C.

---

[18] Perry stresses that no one from LEA ever came by his house to see how he was doing, presumably in an attempt to show that LEA did not engage in the interactive process.  (<u>See</u>, <u>e.g.</u>, Pls.' Statement Material Facts, DE # 99-1, at 48 § IV.D. ¶ 13; M. Perry Dep., DE # 99-2, at 99:25-100:3; P. Briggs Dep., DE # 99-5, at 294:7-295:18; M. Finkelstein Dep., DE # 99-9, at 170:11-13.)  Nevertheless, the record is clear that LEA's representatives, including Terry and LEA attorney Mark Finkelstein, made efforts to communicate with Perry directly and with his personal attorney, Jorgensen, to obtain information regarding Perry's condition while he was absent from work.  (M. Perry Dep., DE # 99-2, at 95:1-18 & Exs. 6, 8-9, 11-13, DE # 92-3, at 123, 126-27, 129-31; A. Terry Aff., DE # 102-7, ¶ 8.)  Thus, Perry has not demonstrated that LEA failed to engage in the interactive process.

Jan. 23, 2012) (report and recommendation), adopted, 2012 WL 684456 (D.S.C. Mar. 1, 2012).

Rather, "it is the responsibility of the individual with a disability to inform the employer that an

accommodation is needed." 29 C.F.R. Pt. 1630, App'x § 1630.9. In this case, Perry's wife

specifically told Briggs on 4 September 2009 that Perry would be out for "10 days" or "two

weeks." (M. Perry Dep., DE # 99-2, at 205:22-206:2; 207:14-18; Defs.' Reply Supp. Mot.

Summ. J., Ex. 1, DE # 102-1, at 5.) The accommodation requested by Perry's wife was in fact

provided by LEA, and Perry requested no other accommodation prior to his separation from

employment.[19]  (M. Perry Dep., DE # 99-2, at 208:3-12.)  Therefore, summary judgment on

Perry's failure to accommodate claim is appropriate.

    4. Sarbanes-Oxley Act Claims

    Next, plaintiffs allege that all of the defendants violated the Sarbanes-Oxley Act of 2002,

18 U.S.C. § 1514A ("SOX"). The court initially considers plaintiffs' claims against LEA. SOX

"creates 'whistleblower' protection for employees of publicly-traded companies by prohibiting

employers from retaliating against employees because they provided information about

potentially unlawful conduct." Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008). The statute

specifically provides:

> No [publicly-traded company], or any officer [or] employee . . . of such company
> . . . , may discharge, demote, suspend, threaten, harass, or in any other manner
> discriminate against an employee in the terms and conditions of employment
> because of any lawful act done by the employee--
>
> (1) to provide information, cause information to be provided, or otherwise assist

---

[19] As previously discussed, Dr. Freedman's second note regarding an additional period of medical leave was not offered or provided to LEA until after LEA had deemed Perry to have voluntarily quit his job on 23 September 2009.  (M. Perry Dep., DE # 99-2, at 205:18-206:8 & Ex. 15, DE # 92-3, at 133; Defs.' Reply Supp. Mot. Summ. J., Ex. C, DE # 102-3.)  See discussion, supra, at 27.  Thus, Perry's argument that this note served as a basis for a request for an accommodation is without merit.

in an investigation regarding any conduct which the employee reasonably
believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud],
1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the
Securities and Exchange Commission, or any provision of Federal law relating to
fraud against shareholders, when the information or assistance is provided to or
the investigation is conducted by--

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person
working for the employer who has the authority to investigate, discover, or
terminate misconduct) . . . .

18 U.S.C. § 1514A(a).

In order to establish a *prima facie* showing of a SOX violation, an employee bears the

initial burden of demonstrating that: (1) the employee engaged in activity protected by SOX; (2)

the employer knew, actually or constructively, of the protected activity; (3) the employee

suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor

in the personnel action. See, e.g., Bechtel v. Admin. Review Bd., 710 F.3d 443, 447 (2d Cir.

2013); Welch, 536 F.3d at 275; Livingston v. Wyeth, Inc., 520 F.3d 344, 351-52 (4th Cir. 2008);

Miller v. Stifel, Nicolaus & Co., Inc., 812 F. Supp. 2d 975, 982 (D. Minn. 2011).  When a

plaintiff establishes a *prima facie* case of unlawful retaliation under SOX, the burden then shifts

to the defendant to demonstrate "by clear and convincing evidence that it would have taken the

same adverse employment action in the absence of the plaintiff's protected activity."  Welch,

536 F.3d at 275; see also Livingston, 520 F.3d at 352-53; 18 U.S.C. § 1514A(b); 49 U.S.C. §

42121(b)(2)(B).

The court initially finds that Perry's SOX claim against LEA must fail because he cannot

establish the third element of his claim, *i.e.*, that he suffered an unfavorable employment action.

As the court has previously discussed, Perry was not discharged. Rather, he was separated from his employment because he abandoned his position. See discussion, supra, at 23-29. Nevertheless, even if Perry had met his burden of demonstrating this element, his SOX claim would still not succeed because he has failed to establish other elements of his *prima facie* case as discussed below.

To establish the first element of their *prima facie* case, plaintiffs must show that they complained to a "Federal regulatory or law enforcement agency . . . or a person with supervisory authority" over them, 18 U.S.C. § 1514A(a)(1)(A), (C), and that their complaint "definitively and specifically"[20] related to: (1) mail fraud, (2) wire fraud, (3) bank fraud, (4) securities fraud, (5) any rule or regulation of the Securities and Exchange Commission or (6) any provision of federal law relating to fraud against shareholders. Welch, 536 F.3d at 275 (citation and internal quotation marks omitted); see also Platone v. U.S. Dep't of Labor, 548 F.3d 322, 326-27 (4th Cir. 2008). In addition, plaintiffs must show that they had both "'a subjective belief and an objectively reasonable belief'" that the conduct they complained of constituted a violation of relevant law. Welch, 536 F.3d at 275 (quoting Livingston, 520 F.3d at 352).

Here, plaintiffs allege that they engaged in protected activities when they reported to LEA's Board, and to the federal government, that Carrington had involved LEA in possible

---

[20] Although the Fourth Circuit Court of Appeals has expressly adopted the "definitively and specifically" standard, a recent decision by the Administrative Review Board ("ARB") of the Department of Labor, the agency charged with enforcing the SOX whistleblower protections, see 18 U.S.C. § 1514A(b), indicates that this standard "has evolved into an inappropriate test and is often applied too strictly." Sylvester v. Parexel Int'l LLC, ARB Case No. 07-123, ALJ Case Nos. 2007-SOX-039, 2007-SOX-042, 2011 WL 2165854, at *15 (U.S. Dep't of Labor May 25, 2011). Instead, the ARB explains that "the critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law." Id. (emphasis in original). Decisions of the ARB are entitled to Chevron deference by this court. See Welch, 536 F.3d at 275-76 & n.2. In this case, however, the court assumes without deciding that plaintiffs' activities meet the higher definite and specific standard. See discussion, infra, at 37. As a result, the court need not now resolve the issue of whether the recent decision by the ARB affects Fourth Circuit precedent.

felonies relating to SAFE Source's export business; when they objected to falsified Board meeting minutes regarding those reports and other LEA matters; when they objected to leaks from the Outside Directors to Carrington regarding their reports of SAFE Source's activities; when they objected to, and refused to pay, what they considered to be fraudulent invoices for legal services submitted by attorney Mark Finkelstein ("Finkelstein"); and when they reported suspected insider trading to a federal agent prior to their being separated from their employment. (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 1, 28-29.) With respect to the first element of plaintiffs' *prima facie* case, it is unclear whether all of the alleged protected activities are protected by SOX. Nevertheless, the court assumes without deciding that all of these activities meet the definite and specific standard and that they fall within one or more of the six enumerated categories listed in Section 1514A of SOX.

The court initially considers plaintiffs' report of suspected insider trading. In July or August 2009, plaintiffs contacted Phil Kuhn ("Kuhn"), an agent with the Bureau of Industry and Security, which is a division of the Department of Commerce. (M. Perry Dep., DE # 99-2, at 222:3-225:6; 270:10-280:11; P. Feldman Dep., DE # 99-4, at 218:1-222:21.) Plaintiffs informed Kuhn of the existence of a Non-Objecting Beneficial Owner ("NOBO") list which was dated 7 October 2004. (Id.) The NOBO list showed who owned LEA stock at that time. (Id.) Plaintiffs' review of the list led them to conclude that insider trading of LEA stock had taken place because some of the shareholders on the list were prominent North Carolina politicians. (Id.; P. Briggs Dep., DE # 99-5, at 319:8-321:21; 325:21-327:10; 330:22-331:13.)

With respect to the first *prima facie* element, the court finds that plaintiffs have failed to raise a genuine dispute of material fact as to whether they had both a subjective belief and an

objectively reasonable belief that their report of possible insider trading was a violation of relevant law. See Welch, 536 F.3d at 275. This element requires an employee to show "both that he actually believed the conduct complained of constituted a violation of pertinent law and that a reasonable person in his position would have believed that the conduct constituted a violation." Id. at 277-78 n.4 (citation and internal quotation marks omitted).

In this case, plaintiffs did not have an objectively reasonable belief that a violation had occurred because they had very little information on which to make the insider trading allegation. The NOBO list was merely a snapshot in time of who owned shares in LEA. It said nothing about why the owners bought shares, the price they paid, how long they had held the shares, or whether they intended to sell the shares. (P. Briggs Aff., DE # 92-7, ¶ 14; M. Perry Dep., DE # 99-2, at 279:5-280:8; P. Briggs Dep., DE # 99-5, at 325:21-326:9; 330:14-16.) Although plaintiffs' evidence of insider trading was extremely thin, they did not try to obtain any additional information before making their report to Kuhn. Because of this paucity of information, plaintiffs lacked an objectively reasonable basis on which to base their report.

Furthermore, plaintiffs cannot establish the second element of their *prima facie* case with respect to this particular activity because they have not shown that LEA knew about their report of suspected insider trading. Although plaintiffs contend that Briggs participated in the call to Kuhn (M. Perry Dep., DE # 99-2, at 276:10-279:4; P. Feldman Dep., DE # 99-4, at 219:21-220:3), it is undisputed that Briggs was a subordinate of Feldman.[21] (P. Feldman Dep., DE # 99-

---

[21] Feldman hired Briggs to be LEA's Controller effective 28 January 2008. In or around May 2008, Briggs became LEA's Chief Financial Officer. (P. Briggs Dep., DE # 99-5, at 18:6-12; P. Briggs Suppl. Aff., DE # 102-4, ¶ 4.) Briggs reported to Feldman. (P. Feldman Dep., DE # 99-4, at 42:17-19.) Briggs became President of LEA and also became a member of the Board in December 2009, which was after plaintiffs had been separated from their employment. (M. Perry Dep., DE # 99-2, at 153:2-25; P. Briggs Dep., DE # 99-5, at 19:1-15.)

4, at 42:17-19; P. Briggs Dep., DE # 99-5, at 18:6-21:9.)  Because Briggs did not have

supervisory authority over plaintiffs, see 18 U.S.C. § 1514A(a)(1)(C), his knowledge of the

report of insider trading is insufficient to demonstrate LEA's knowledge of the report.

Plaintiffs also admit that they did not tell the Outside Directors about the call they made

to Kuhn regarding the NOBO list.  (M. Perry Dep., DE # 99-2, at 225:15-226:1; 280:12-15; P.

Feldman Dep., DE # 99-4, at 165:19-23.)  Nevertheless, they maintain that the Outside Directors

were made aware of the report through Briggs.  (See Pls.' Mem. Opp'n Mot. Summ. J., DE # 99,

at 29; Pls.' Statement Material Facts, DE # 99-1, at 14 § I.G.)  However, this is pure speculation

on the part of plaintiffs.  They have failed to present any credible evidence in support of their

contention that Briggs told the Outside Directors about the call with Kuhn.[22]  Moreover, in their

memorandum in opposition to the motion for summary judgment, they concede that "the Outside

Directors' knowledge [of the report made to Kuhn] is not certain . . . . "  (Pls.' Mem. Opp'n Mot.

Summ. J., DE # 99, at 29.)  The undisputed evidence is that Briggs has denied telling anyone else

at LEA about the 2004 NOBO list.  (P. Briggs Aff., DE # 92-7, ¶ 15.)  It is axiomatic that LEA

could not retaliate for alleged whistleblower conduct of which it was unaware.  Thus, plaintiffs

have failed to raise a genuine dispute of material fact as to LEA's actual or constructive

knowledge of their report of possible insider trading.  For the foregoing reasons, their SOX

claims regarding this report are not viable.

All of plaintiffs' other alleged protected activities occurred between late December 2007

---

[22] For example, when Feldman was asked to explain why he thought that Briggs reported the call to the
Outside Directors, his response was: "I think . . . a lot of things. . . .  I just go back to the old adage; if it walks like a
duck, quacks like a duck, it's a duck."  (P. Feldman Dep., DE # 99-4, at 223:3, 14-16.)

and early May 2008.[23]  Plaintiffs contend that they told the Outside Directors about the issues

caused by Carrington's ownership of SAFE Source, including LEA's potential liability, during

the Board meeting that occurred on 27 December 2007.  (M. Perry Dep., DE # 99-2, at 324:3-

325:20; P. Feldman Dep., DE # 99-4, at 188:13-189:19; 190:12-191:12.)  Rand allegedly leaked

information to Carrington regarding the issues raised in the 27 December 2007 Board meeting

shortly after the meeting took place.  (M. Perry Dep. DE # 99-2, at 258:19-262:17; P. Feldman

Dep., DE # 99-4, at 191:13-193:6; E. Littman Dep., DE # 99-15, at 86:14-87:6.)

   In addition, on 14 January 2008, plaintiffs sent a letter to Kuhn regarding Carrington's

ownership of SAFE Source and the illegal export business that SAFE Source conducted with

LEA, and they met with Kuhn within two weeks of the date that the letter was sent.  (M. Perry

Dep., DE # 99-2, at 227:22-230:2; 244:15-245:13; 264:13-265:1; P. Feldman Dep., DE # 99-4, at

166:7-167:15; Pls.' Mem. Opp'n Mot. Summ. J., Ex. 44, DE # 99-45.)  Feldman further reported

to Kuhn that Rand was revealing the proceedings of LEA Board meetings to Carrington and that

Rand knew that competing versions of Board meeting minutes had been drafted without a

finalized version ever being adopted.  (Pls.' Statement Material Facts, DE # 99-1, at 14 § I.F. ¶ 4;

M. Perry Dep., DE # 99-2, at 249:16-250:6 & Ex. 38, DE # 92-3, at 221-229; P. Feldman Dep.,

DE # 99-4, at 249:22-251:2; Pls.' Mem. Opp'n Mot. Summ. J., Ex. 28, DE # 99-29; id., Ex. 46,

DE # 99-47.)  Finally, plaintiffs disagreed with and contested the contents of invoices for legal

services that Finkelstein submitted to LEA from late 2007 through 1 May 2008.  (Pls.' Statement

Material Facts, DE # 99-1, at 16-17 § I.H. ¶¶ 2, 4; M. Perry Dep., DE # 99-2, at 218:7-221:4; P.

_____

[23] Although the exact dates of several of plaintiffs' complaints are not manifestly clear from the record (see, e.g., M. Perry Dep., DE # 99-2, at 218:7-221:4; P. Feldman Dep., DE # 99-4, at 174:18-20; 249:22-251:2; J. Jordan Dep., DE # 99-17, at 90:19-91:19), it is reasonable to infer that the complaints were made soon after the objectionable conduct occurred.

Feldman Dep., DE # 99-4, at 170:7-175:8; J. Jordan Dep., DE # 99-17, at 90:19-91:19; Pls.'

Mem. Opp'n Mot. Summ. J., Ex. 15, DE # 99-16.) The court finds that plaintiffs have presented

sufficient evidence to raise a genuine dispute of material fact regarding LEA's awareness of

these activities.[24] (See, e.g., Pls.' Statement Material Facts, DE # 99-1, at 16-21 §§ I.H., II.)

With regard to these remaining SOX activities, plaintiffs must demonstrate that their

whistleblowing was a contributing factor in the unfavorable personnel actions that were taken

against them.[25] "A 'contributing factor' is any factor, which alone or in combination with other

factors, tends to affect in any way the outcome of the decision." Allen v. Admin. Review Bd.,

514 F.3d 468, 476 n.3 (5th Cir. 2008) (citation and internal quotation marks omitted); cf. Marano

v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (Whistleblower Protection Act case).

"Temporal proximity between the protected activity and the adverse action is a significant factor

in considering a circumstantial showing of causation." Fraser v. Fiduciary Trust Co. Int'l, No.

04 Civ. 6958(PAC), 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (citation and internal

quotation marks omitted), aff'd 396 F. App'x 734 (2d Cir. 2010) (unpublished); see also Van

Asdale v. Int'l Game Tech., 577 F.3d 989, 1003 (9th Cir. 2009) ("[C]ausation can be inferred

from timing alone where an adverse employment action follows on the heels of protected

---

[24] The court also notes that plaintiffs conclusorily state that they "continued their protected activity through the times of their firings . . . ." (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 28; see also Pls.' Statement Material Facts, DE # 99-1, at 3 § I. ("Feldman and Perry engaged in protected activity under SOX by . . . continuing to cooperate in a federal investigation.").) However, they have pointed to no evidence to support this contention, and the court is not obligated to scour the record in search of a dispute of material fact. Furthermore, even if plaintiffs did engage in additional protected activities, they have not cited to any record evidence to show that LEA was aware of such activities. The only evidence that plaintiffs have set forth regarding LEA's knowledge of their protected activities relates to events that occurred between 27 December 2007 and 1 May 2008. (See, e.g., Pls.' Statement Material Facts, DE # 99-1, at 16-21 §§ I.H., II.)

[25] The court assumes *arguendo* for the purposes of this discussion that Perry suffered an adverse employment action.

activity." (citation and internal quotation marks omitted)).

LEA argues that the temporal gap between plaintiffs' last complaint and their separation from employment is not sufficiently proximate to demonstrate that the protected activity was a contributing factor in the adverse personnel actions. In this case, the last protected activity that LEA had knowledge of allegedly occurred following the 1 May 2008 submission of Finkelstein's invoice for legal services rendered. (Pls.' Mem. Opp'n Mot. Summ. J., Ex. 15, DE # 99-16.) However, Feldman was not terminated until 27 August 2009, and Perry was not separated from his employment until 23 September 2009. Here, the gap of approximately sixteen to seventeen months between the protected activity and the unfavorable employment actions is simply too attenuated to establish the causation necessary to sustain their SOX claims. See, e.g., Miller, 812 F. Supp. 2d at 988 (eight-month gap between plaintiff's last complaint and her discharge was not sufficiently proximate to demonstrate that the protected activity was a contributing factor to her termination); Fraser, 2009 WL 2601389, at *6 (ten-month gap in time defeated SOX claim); Pardy v. Gray, No. 07 Civ. 6324(LAP), 2008 WL 2756331, at *5-6 (S.D.N.Y. July 15, 2008) (six-month gap in time defeated SOX claim).

In response, plaintiffs argue that they are not relying on "mere temporal proximity" but are also relying on "evidence of recurring retaliatory animus" to show that their protected activity was a contributing factor to their separation from employment. (Pls.' Mem. Opp'n Mot. Summ. J., DE # 99, at 29 (internal quotation marks omitted).) It is true that where an employee provides other evidence indicating a connection between his protected activity and the adverse personnel action, some courts allow for a more relaxed temporal proximity in SOX cases. See, e.g., Leshinsky v. Telvent GIT, S.A., — F. Supp. 2d —, No. 10 Civ. 4511(JPO), 2013 WL

42

1811877, at *14 (S.D.N.Y. May 1, 2013); Barker v. UBS AG, 888 F. Supp. 2d 291, 300-01 (D. Conn. 2012).

In determining whether plaintiffs have demonstrated the existence of a recurring retaliatory animus, the court notes that plaintiffs and defendants agree that "[a] split existed between the Outside and Inside Directors . . . ." (Pls.' Statement Material Facts, DE # 99-1, at 2 ¶ B; see also Defs.' Mem. Supp. Mot. Summ. J., DE # 92-1, at 2.) While the exact cause of the split is hotly disputed, it is clear that it was related to the announcement of Carrington's sale of LEA stock to Raymond James. (See, e.g., P. Briggs Aff., DE # 92-7, ¶ 3; P. Briggs Aff., DE # 92-13, ¶¶ 14-15; S. Carrington Aff., DE # 92-14, ¶ 3; Pls.' Statement Material Facts, DE # 99-1, at 22-25 § III.A.; P. Feldman Dep., DE # 99-4, at 180:6-181:25; P. Briggs Dep., DE # 99-5, at 265:14-266:1; M. White Dep., DE # 99-6, at 43:20-44:21; E. Littman Dep., DE # 99-15, at 38:7-39:12; 53:4-54:18; 71:19-74:4; 156:21-157:15.) Plaintiffs first learned about the sale sometime in August or September 2007. (P. Briggs Aff., DE # 92-13, ¶ 14; P. Feldman Dep., DE # 99-4, at 181:5-182-19; Pls.' Mem. Opp'n Mot. Summ. J., Ex. 45, DE # 99-46.)

Importantly, plaintiffs admit that this split between the Inside Directors and the Outside Directors "was already in existence at least as of November 1, 2007."[26] (Pls.' Statement Material Facts, DE # 99-1, at 2 ¶ B.) Thus, the animus between plaintiffs and the Outside Directors developed before plaintiffs' first protected activity occurred on 27 December 2007. This refutes

---

[26] The court notes that 1 November 2007 was a particularly significant date with regard to the exacerbation of the rift between the Inside and Outside Directors that began when Carrington announced the sale of LEA stock. At a Board meeting on that date, by a vote of three to two, the Outside Directors withdrew the Board's prior vote to approve employment contracts for Perry and Feldman. (M. Perry Dep., Ex. 38, DE # 92-3, at 223-24.) This was also the first Board meeting attended by Finkelstein, who just "showed up" with Rand. (E. Littman Dep., DE # 99-15, at 26:8.) Plaintiffs initially tried to exclude Finkelstein from participating, but they ultimately allowed him to remain, and the meeting went forward. (Id. at 26:3-27:2; M. Perry Dep., DE # 99-2, at 234:22-235:8; A. Rand Dep., DE # 99-3, at 154:9-156:12.)

plaintiffs' contention that LEA had a retaliatory motive in taking adverse action against them. See Sussberg v. K-Mart Holding Corp., 463 F. Supp. 2d 704, 713-14 (E.D. Mich. 2006) (defendant's motion for summary judgment granted where there was a five-month gap between protected activity and termination and where there was evidence of ongoing performance problems prior to the protected activity); Bechtel v. Competitive Techs., Inc., ARB Case No. 09-052, ALJ Case No. 09-052, 2011 WL 4889269, at *10 (U.S. Dep't Labor Sept. 30, 2011) (protected activity not a contributing factor where complainant admitted that his relationship with employer had rocky moments as early as August 2002, which was well before his first protected activity occurred in December of that year).

Moreover, plaintiffs have failed to demonstrate that they were actually retaliated against in any way prior to their separation from employment. Although it is evident that palpable tension and disagreements existed between plaintiffs and the Outside Directors, plaintiffs did not experience a demotion, a decrease in salary, a material loss of benefits, significantly diminished material responsibilities, disciplinary action, harassment, or other indices unique to their situation following their protected activities. Cf. Bechtel, 2011 WL 4889269, at *10 (complainant "failed to establish that any of his protected activity, intermixed as it was with his ongoing disagreements and heated discussions with [the company's CEO] over business decisions, contributed to his discharge.").

The lack of causal connection between plaintiffs' complaints and their separation from employment is further bolstered by the intervening events of 2009. See Sussberg, 463 F. Supp. 2d at 713 ("a 'legitimate intervening event' may defeat any causal inference that might be premised upon temporal proximity" (citation omitted)). Here, the factual record indicates that

44

the legitimate intervening basis for Feldman's termination in August 2009 was the determination

that he was insubordinate when he made comments to the Wortleys about the Outside

Directors's lack of involvement in LEA's operations and then emailed the Outside Directors and

urged them to resign from the Board. (See, e.g., E. Littman Dep., Ex. 26, DE # 92-12, at 253:25-

254:20; 256:21-258:10; A. Rand Aff., DE # 92-15, ¶ 11; J. Jordan Aff., DE # 92-16, ¶ 5; J.

Lindsay Aff., DE # 92-17, ¶¶ 7-8; A. Rand Dep., DE # 99-3, at 262:12-21 & Ex. 33, DE # 92-10,

at 70; P. Briggs Dep., DE # 99-5, at 155:14-157:19; J. Lindsay Dep., DE # 99-7, at 66:13-20; J.

Jordan Dep., DE # 99-17, at 35:14-36:19; 53:15-54:11.) Similarly, the factual record indicates

that the legitimate intervening basis for Perry's separation from employment was his failure in

September 2009 to respond to LEA's request for information regarding his intention to return to

work. (M. Perry Dep., DE # 99-2, at 90:19-91:2 & Ex. 14, DE # 92-3, at 132; A. Terry Aff., DE

# 102-7, ¶¶ 6, 8.) See Miller, 812 F. Supp. 2d at 989 (plaintiff failed to establish causation

between protected activity and termination where there was a legitimate intervening basis for the

adverse action); Fraser, 2009 WL 2601389, at *6 (same).

 In sum, plaintiffs have failed to demonstrate causation based on a combination of factors:

the utter lack of temporal proximity between the protected activities and plaintiffs' separation

from employment; the rocky relationship that existed between plaintiffs and the Outside

Directors prior to the start of any protected activity; and the intervening events of 2009.

Examining the evidence in the light most favorable to plaintiffs, no reasonable jury could find

that their alleged protected activities were a contributing factor in LEA's decision to separate

them from their employment.

 Because plaintiffs have failed to establish a *prima facie* causal connection, the court need

not examine whether LEA can show by clear and convincing evidence that it would have taken the same actions against plaintiffs even if it did not know of their complaints.  Nonetheless, the court notes that, for many of the same reasons discussed above, LEA has demonstrated that it had a legitimate business reason for its actions, and the court in a SOX case cannot sit as a "super personnel department" to "second guess an employer's facially legitimate business decisions."  Riddle v. First Tenn. Bank, Nat'l Ass'n, 497 F. App'x 588, 596 (6th Cir. 2012) (unpublished) (citation and internal quotation marks omitted).

Finally, there can be no SOX liability against Rand, Lindsay, Jordan, or Briggs.  The claims against them fail just as they have failed with respect to LEA.  Plaintiffs have not made a specific argument in their memorandum in opposition to the motion for summary judgment with respect to these individuals.  As a result, the individual defendants are entitled to summary judgment with respect to plaintiffs' SOX claims.

C.     LEA's Counterclaim for Breach of Fiduciary Duty

Remaining before the court is LEA's counterclaim against plaintiffs for breach of fiduciary duty.  (Defs.' Answer, DE # 36, at 44-57.)  Neither plaintiffs nor defendants have made a motion with respect to this counterclaim.  The cause of action described in the counterclaim is founded in state law and lacks any independent jurisdictional basis.  The governing statute, 28 U.S.C. § 1367(c)(3), permits a district court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims.  Furthermore, in Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988), the United States Supreme Court stated that when all federal claims are eliminated before trial, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and

dismissing them without prejudice.  See also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of . . . right. . . .  [I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  Having now resolved all of the claims asserted in plaintiffs' amended complaint, the court declines to retain and exercise supplemental jurisdiction over LEA's counterclaim and will dismiss that claim without prejudice.

## III.  CONCLUSION

Plaintiffs' motion for leave to file a separate statement of material facts in conjunction with their opposition to defendants' motion for summary judgment (DE # 97) is GRANTED. Defendants' motion for summary judgment (DE # 92) is GRANTED.  Plaintiffs' motion to continue the trial (DE # 95) is DENIED AS MOOT.  LEA's counterclaim against plaintiffs is DISMISSED WITHOUT PREJUDICE.  The Clerk is directed to enter judgment in favor of defendants and close the case.

This 27 June 2013.


_____
W. Earl Britt
Senior U.S. District Judge

47